Alexander Del Giorno, J.
Floyd F. iSorrenti.no, who was a funeral director and emibalmer for 20 years, and who, since 1951, had ibid for and performed six other contracts with the State for the removal of bodies from cemeteries affected by highway construction, entered into the present contract with the State of New York on the 25th day of January, 1956 for the: “ Removal of all human remains from the burial ground on *331 Map 21, Parcel 24, City of Amsterdam, Route 5-S, Arterial Connection, City of Amsterdam, County of Montgomery.”
Prior to the contract, but after receiving copy of notice of bids, claimant stated that he went to the site to examine the cemetery and gather information concerning the number of bodies to be removed and the manner of best accomplishing the same. At the cemetery proper he saw many broken headstones and the outlines of a road already cut through by the general highway contractor. At and around this cut he saw bones and caskets sticking out of the ground. He inquired of the church and neighbors and was told that this cemetery, which was a Catholic cemetery, belonged to St. Mary’s Parish in Amsterdam, and had not been used for 50 years or more. He further testified that the area of the cemetery was some 3% acres. The claimant asserted that from his investigation he had formed an opinion that there were some 4,000 bodies buried in that cemetery. He gave this opinion to Mr. John S. Hadala, the State engineer in charge of that highway construction, who told claimant that, in his opinion, and from what he had been able to ascertain, there were no such number of bodies.
Claimant testified further that he started the work of removing bodies on April 11,1956, in the presence of George C. Gifford, a State engineer, who had been placed in charge of the removal process, and Father Edward H. Gilmour, the assistant to Monsignor Walsh, who was the pastor of St. Mary’s Church. They had a conference at the site, and all agreed that, as the digging went on, where an outline of a casket was indicated, that was to be considered as a grave whether there were any visible remains of the content or not. The parties agreed that, where there had been a casket, although it was now entirely decomposed, the deteriorated lumber of the casket left a discoloration in the ground that clearly marked its previous existence and shape.
Father Gilmour testified that where only such outline was indicated, nevertheless it represented a “ moral grave ” which contained the remains of a person originally buried therein. The priest insisted that from this “ moral grave ” the claimant should pick any bits of bones, metal, screws, nails or wood, and if none of these were present, the claimant was to pick therefrom what were the decomposed ashes of a human body and place them in the new and smaller box and count that as a body. Father Gilmour testified also that he had been placed in charge of the removal operations by his pastor and that his judgment was to determine what constituted a grave pursuant to the tenets of the Catholic Church. He stated that as a matter of *332 morals and conscience, he had to ascribe this singular identity to a grave even where it was only a “ moral grave Father Grilmour asserted that Mr. Hadala agreed with him as to what was a “ moral grave ”.
For himself, Mr. Hadala testified that while he accepted the priest’s definition of a “ moral grave ” he disputed with the priest that a “ moral grave ” should be considered as a separate entity. Mr. Hadala conceded, however, that he did not contradict the priest any more than above stated, nor did he prevent the claimant from placing the remains of each “ moral grave ” in a separate box.
Father Grilmour and the State representatives strictly supervised the removals. Thus, Sorrentino was in no position to dispute, even if he wanted to, the position taken by the priest who was, as stated, accepted by all concerned as the arbiter of what was to be considered a grave.
But the dispute basically was not limited to what was or was not a grave. It also involved the question of whether the claimant was restricted to payments on the basis of the contract as drawn or on a unit basis of each removal as bid by Mm. The contract of January 25,1956 specified that it was for “ removal of ,all human remains from the burial ground ’ ’ and stipulated that the State would pay to claimant the sum of $6,000. However, this contract cannot be considered at its own face value because it is based upon the proposal and specifications (bid) which were submitted by the claimant and is attached to the contract. The court considers the bid the basic portion of the contract. In this bid the claimant bid $44.98 per body transferred, which sum included al-1 phases of work, labor, materials and equipment required for each disinterment and reinterment in the new St. Mary’s Cemetery. The contract, as drawn, was inclusive of the estimated number of bodies and was also inclusive of $1,300 for each common burial plot required in the new cemetery as well as $600 for a suitable monument.
The $6,000 set out in the contract was based on a guess as to the estimated number of bodies thought to be buried there. The fact that the State also considered the contract as one of payment to the claimant on a unit basis is indicated most affirmatively by the letter marked as claimant’s Exhibit 22, dated January 4, 1956 (or 21 days before the awarding of the contract to claimant) written by Mr. P. (Paul) GL Baldwin, Director of the Bureau of Rights of Way and Claims, to H. A. Cohen, Director, Bureau of Contracts & Accounts, which is quoted: ‘‘ Inasmuch as the number of bodies located on the above parcel cannot be ascertained, it is believed that an arbi *333 trary figure of $6,000 be made to cover all of the conditions of the specifications herein, and it is further recommended that the performance bond be in a sum of not less than $6,000.00. ’ ’
The fact is that this cemetery was over 100 years old and no interment had taken place therein for over 50 years. The records of burials, if there had been any, were not available. The priests had hardly more knowledge of the number of interments therein than did the State or the claimant.
The claimant described how the work was done. He had a small bulldozer with a blade in front. This removed the earth a little at a time until the casket or outline thereof was reached, whereupon the rest of the digging was done manually.
The boxes used for the transfer of the remains were in dimension 18 inches long by 12 inches wide by 10 inches high and were made of one-inch white pine boards. As the remains from each grave were placed therein, each box was nailed shut and then numbered by the State agent. Then the claimant would remove it to a building which was on the grounds and which was kept locked. During April and May, 1956, the claimant removed 133 bodies, of which 30 were “ moral graves ”. In May, 1956 also, the claimant received from the State an estimate of work done to May 20, which set forth that there was due to the claimant payment for the 133 bodies in the sum of $5,682.34. The State also estimated that, as of then, the job was 50% completed. This sum paid to the claimant was based upon the unit payment of $44.98 less $300 retained by the State.
The claimant continued his work. However, feeling confused by this equivocal situation, he requested through Mr. Hadala that the State give him a supplemental contract which would clarify their respective rights and obligations. Some two or more months later, during July or August, he received a reply from Mr. Hadala. By this time he had removed some 2,000 bodies. Then, sometime in August, 1956, Mr. Hadala advised the claimant that if he would consider accepting $44.98 each for the first 2,000 bodies removed, and $42 each for the remaining bodies, he could get a supplemental contract from the State. The claimant agreed and signed the supplemental contract on August 16, 1956 which was approved on August 21, 1956 by A. M. San, Assistant District Engineer, and on August 27, 1956 by J. J. Raymond, Assistant Deputy Chief Engineer.
In the supplemental agreement, which was prepared by the Department of Public Works, Construction Division, it was clearly stated that there were 3,500 bodies to be removed and transferred and provided for payment thereof on a unit basis as above indicated.
*334 The two State inspectors who supervised the work of removals, each made notes of every grave and content, in addition to numbering each removal. Each stated that only remains which were found within the outline of each casket were placed in each new box.
The State, unable to accept the inevitable, and seemingly not confident of its own employees, had representatives of the State Department of Health examine practically all the boxes. These were opened by the claimant at their request. They reported to have found 750 boxes which had bones as well as 20 other boxes in which had been placed the bones unearthed by the digging of the general contractor when he cut through the cemetery. They testified that 1,964 boxes were without bones, but some had fragments of wood, plates, glass, handles, etc. Later, they conceded that an additional 401 boxes contained bones. They made this concession based upon the facts that an additional number had been reported by the State agents who supervised .each removal. The State also presented a large number of pictures which were made of all the boxes the State disputed. For his part, the claimant anticipating his future troubles, had a chemist examine 51 boxes which were picked at random from those known as “moral graves ”. The chemist testified that in each instance the tests indicated the presence of a decomposed body by the phosphate content.
About March 12,1957, before the claimant could finish removal of all the bodies, he was told by the State to leave the job. At that time he claimed to have removed 2,839 bodies. About August 8,1957 the State obtained a new bid from another person. In its specifications the State estimated some 400 additional bodies were left in the cemetery for removal. The State requested bids on a unit basis.
This is the chain of events which were presented to the court. It is evident that this case presented the difficulties recounted for the simple reason that both sides were unaware of what was underground when the bids were submitted and the contract was executed. Obviously, they could not find out until the actual digging was in progress. The testimony indicated that when the claimant submitted his bid, there were other bidders also. All bidders bid on a unit basis and all were much higher than claimant’s bid. I find that Mr. Baldwin’s letter is the Achilles’ heel of the State. By this letter the State assumed that there were 90 bodies in the cemetery and the contract amount of $6,000 was to reflect that estimate and nothing else. The State figured on 90 bodies at $44.98 for each removal, plus $1,300 for *335 the new common bnrial plot, plus $600 for a monument, or a total of $6,000.
Thus, no other interpretation can be placed upon the facts disclosed. That was their contract — to pay the claimant for each grave on a unit basis of removal. If the court was to accept the contention raised by the State in its brief, the court would have to agree that the State could play fast and loose with the facts, and could impose any type of contract upon a bidder, whether it conformed to the facts or not, when the State was fully aware of what were facts as far as it knew. The State knew why it set down $6,000 as a contract price, for it assumed that only 90 to 92 bodies were interred in the cemetery. It kept this supposition to itself.
The only point the State made which might have been determined adversely to the claimant in whole or in part, was that of the “ moral graves ”. But as to that point, the court must resolve it in favor of the claimant. Here we are dealing with one of the great established religions, the Catholic. The court takes judicial notice that its respect for the dead is one of its basic tenets of faith and morals; as, for example, it observes Ash Wednesday by the distribution of ashes to its adherents as a reminder that “ dust thou art and to dust returnest ”. Therefore, Father Gilmour, as a priest of the Catholic Church, has to give practical effect to the belief of his Church. To him, the outline of each casket represented some one who had believed, as he does, whose soul might be in Heaven but whose mortal remains, whether intact or reduced to ashes are to remain here on earth until Judgment Day.
Since he was accepted as the arbiter, his interpretation binds the parties as to what was a body.
Therefore, the court determines that the claimant exhumed and reinterred 2,839 bodies, for which he shall be compensated, as indicated in the findings of fact herewith signed.